**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, Derivatively on Behalf of BAXTER INTERNATIONAL INC., <br><br> Plaintiff, <br><br> vs. <br><br> WALTER E. BOOMER, BLAKE E. DEVITT, JOHN D. FORSYTH, GAIL D. FOSLER, JAMES R. GAVIN III, PETER S. HELLMAN, WAYNE T. HOCKMEYER, JOSEPH B. MARTIN, ROBERT L. PARKINSON JR, CAROLE J. SHAPAZIAN, THOMAS T. STALLKAMP, K.J. STORM, ALBERT P.L. STROUKEN, ROBERT M. DAVIS, NORBERT G. REIDEL, JOY A. AMUNDSON, and PETER ARDUINI, <br><br> Defendants, <br><br> – and – <br><br> BAXTER INTERNATIONAL INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, WASTE, GROSS MISMANAGEMENT, UNJUST ENRICHMENT, AND AIDING AND ABETTING A CONSPIRACY** <br><br> **[REDACTED VERSION]** <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Westmoreland County Employee Retirement System ("Plaintiff"), by its undersigned attorneys, submits this Verified Shareholder Derivative Complaint on behalf of Baxter International Inc. ("Baxter" or the "Company"), and alleges as follows, upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included among other things, a review of documents produced by Baxter pursuant to §220 of Delaware General Corporation Law, 8 Del. C. §220, a review of Baxter's Securities and Exchange Commission ("SEC") filings, news reports, press releases, analysts' reports, investor conference calls, medical journals, Food and Drug Administration ("FDA") 483 letters and warning letters, and other publicly available documents regarding Baxter.

## INTRODUCTION

1.      This is a shareholder derivative action brought by Plaintiff, a shareholder of Baxter since 2006, on behalf of nominal defendant Baxter against its current Board of Directors (the "Board") and certain of its current and former officers seeking redress for breaches of fiduciary duty, waste of corporate assets, gross negligence, unjust enrichment, insider trading, and aiding and abetting a conspiracy, all to the grave detriment of the Company.

2.      The relevant period of Defendants' wrongful conduct extends from January 2008, through and including the present ("Relevant Period").  On behalf of Baxter, Plaintiff seeks broad scale corporate and managerial reforms, damages, accounting, compensation to the Company and disgorgement of the profits by the Insider Trading Defendants (defined *infra* at 43).

3.      Plaintiff's claims arise out of the following related incidents committed by the Defendants:

(a)      the reckless failure to conduct **any** quality control over a supplier of an

1

essential ingredient for Heparin manufactured in a plant in China, *resulting in deaths of more than 80 patients*, multiple product liability class action lawsuits, a drop of approximately 15% in stock value, and the issuance of false and misleading statements regarding prophylactic steps taken by the Company to ensure quality control over every step in its manufacturing process;

      (b)    the failure to comply with the Consent Decree for Condemnation and Permanent Injunction entered between Baxter and the FDA on June 29, 2006 (the "2006 Consent Order" attached as Exhibit A to the Complaint) regarding the remediation of defects in Baxter's Colleague Infusion Pumps, which purportedly *claimed the lives of more than 500 patients*, and the issuance of false and misleading statements regarding the Company's violation of the Consent Decree;

      (c)    causing the Company to issue material false statements regarding forecasted revenue and earnings growth in its plasma protein therapies business, giving the market a false belief that the current profitability in that business would continue unabated, even though Defendants knew that was not the case;

      (d)    not correcting the Company's persistent failure to adhere to the quality control and compliance guidelines promulgated by the United States and the European Union ("EU"), including misstating the efficacy of a key product, ARALAST NP, as described in an FDA August 3, 2010 warning letter (Exhibit B to the Complaint), and permitting a bacterial contamination of peritoneal dialysis solutions sold in the EU in December 2010 resulting in a risk of harm to patients, a forced recall of the tainted product, and further harm to the Company's reputation; and

      (e)    permitting Defendants Carole J. Shapazian, Thomas T. Stallkamp, and Norbert Reidel to engage in insider trading in an amount in excess of $11,000,000.

    4.    Each of these incidents is characterized by the utter and complete failure of the

Director Defendants (defined *infra* at ¶¶22-37) to maintain adequate internal controls over: (i) the manufacturing and sales operations of its pharmaceutical products; and (ii) the truthful reporting of material events. Further, Defendants misrepresented to the market that such reporting and operational shortfalls existed even though they were well aware of the "ticking time bomb" created by the lack of internal controls.

5.     As a result of the Defendants' wrongful conduct, Baxter lost significant credibility, faces multiple wrongful death, personal injury and securities class action lawsuits, has taken writedowns of approximately $1 billion and suffered a substantial diminution in the price of its stock. There are three significant dates within the Relevant Period where the stock price of Baxter was pummeled. Indeed, upon public revelation of Baxter's woefully deficient quality controls over its manufacturing processes, and its dishonest reporting. First, a United States Congressman's call for an investigation and widespread media coverage of Baxter's Heparin contamination in November 2008 revealed the depth of its unsatisfactory quality control procedures and the share price dropped 15% from $57.07 per share on November 19, 2008 to $48.50 on November 20, 2008. Second, on April 22, 2010, when the Company finally reduced its revenue guidance for 2010 from growth in the range of 5-7% to a range of 1-3%, the stock price, hammered by massive sales, dropped $7.82 per share to close at $51.13 per share. And yet again, on May 3, 2010, Baxter's stock dropped $2.42 per share to close at $45.68 per share when the Company was forced to reveal its non-compliance with the 2006 Colleague Pump Consent Decree.

## BACKGROUND AND SUMMARY OF THE ACTION

6.     Baxter, headquartered in Deerfield, Illinois, through its subsidiaries, develops, manufactures, and markets products for people with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions. The Company

3

operates in three business segments: BioScience, Medication Delivery, and Renal. The BioScience division is focused on processing recombinant and plasma-based proteins. Plasma protein therapies treat certain medical conditions such as hemophilia, other bleeding disorders, burn and shock victims and includes products for regenerative medicine such as vaccines. Since a basic source material in the BioScience segment -- human plasma -- is highly susceptible to pathogens, it is critical that the quality of the product be scrupulously maintained and closely monitored. The Medication Delivery segment manufactures and markets infusion pumps and other products related to drug administration. The Renal segment provides products to treat end-stage renal disease or irreversible kidney failure.

7. During the Relevant Period, Defendants, among other things, issued materially false and misleading statements to the public regarding the Company's BioScience division. Indeed, knowing that quality control over the safety and efficacy of Baxter's pharmaceutical products is essential to the value of a pharmaceutical company, and required by governmental regulators, the Defendants represented to the market that Baxter performed regular assessments of its suppliers of raw materials, components and finished products. This representation was materially false and Defendants knew it was false when the statement was made. In truth, Baxter obtained a key ingredient in Heparin, a blood thinner used primarily for patients to reduce stroke risk or blood loss during surgery, from a manufacturing plant in China that it ***had never once inspected***. In January 2008, one of the "ticking time bombs" exploded when contaminated Heparin caused patients to suffer severe allergic reactions, injury and death, and precipitated a massive Class I recall of the product.

8. The Defendants' wrongdoing was not limited to a reckless disregard of the safety and efficacy of Baxter's pharmaceutical products. Throughout 2009 through April 2010, the Defendants

repeatedly assured investors that the performance of the Company's plasma protein therapies business was bound to continue due to "market dynamics." The Defendants knew, however, that the "market dynamics" had actually shifted and the Company's plasma protein therapies business was shrinking. Defendants also failed to disclose that the Company was not complying with the 2006 Colleague Pump Consent Decree. As a result of these false statements and material omissions, Baxter's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $61.71 per share on January 14, 2010.

9.     On April 22, 2010, Baxter reported its first quarter 2010 financial results, shocking investors by unexpectedly lowering its revenue and earnings outlook for 2010. Baxter disclosed that due to pressures in its plasma-based products business, including a loss in market share, it was reducing its 2010 revenue guidance for its plasma-derivative products from growth in the mid- to high-single-digit range, to a decline in the mid-single-digit range.

10.     On this news, Baxter's stock price lost $7.82 per share, to close at $51.13 per share -- a one-day decline of over 13% -- as Baxter investors sold off more than 50 million shares, 13 times the average three-month daily volume. This marked the largest one-day decline in the Company's stock price in over seven years.

11.     Then, on May 3, 2010, in the second blow of a one-two punch, Baxter revealed that the FDA had ordered the Company to recall all of its approximately 200,000 Colleague Infusion Pumps currently in use in the United States because the Company submitted an unacceptable correction plan to the FDA. In its own release, issued on May 4, 2010, the FDA stated that the recall and destruction of the pumps was necessary due to Baxter's "***longstanding failure to correct many serious problems with the pumps***." (Emphasis added). The FDA also noted: "[i]n the past five years [it had] received more than 56,000 reports of adverse events associated with the use of infusion

pumps. Those events have included serious injuries and ***more than 500 deaths***." (Emphasis added).

12. Upon the announcements, Baxter's stock declined $2.42 per share on heavy volume to close at $45.08 per share on May 4, 2010 -- a one-day loss of over 5%.

13. As a result of the staggering losses sustained by Baxter investors on these revelations, on September 21, 2010, a securities class action was commenced against the Company on behalf of purchasers of Baxter common stock asserting claims under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5.

14. Baxter's quality control failures and disregard of governmental standards continues. On August 3, 2010, the FDA issued a warning to Baxter for falsely advertising the efficacy of a key product, ARALAST NP, to physicians. The August 3, 2010 Warning Letter states: "***since we have cited you for similar violations in the recent past***, we request a response in writing indicating what policies and procedures your firm intends to adopt to ensure your prescription drug promotional activities comply with the Act and its implementing regulations, and an explanation of why/how you expect these policies and procedures to succeed." On December 17, 2010, the European Medicines Agency announced that Baxter's dialysis solutions sold in Europe, the Middle East, Africa and Argentina needed to be replaced because of the presence of potentially harmful bacteria in the affected batches that could cause dangerous inflammation in patients who are receiving the tainted batches of the peritoneal-dialysis therapy.

15. At the same time that the Defendants were failing to comply with their fundamental obligation to ensure that the Company have in place an adequate system of operational controls over product quality and financial reporting, and while the Defendants were divulging false information and withholding material information necessary to make the Company's statements to the investing public truthful, certain of the Defendants, the Insider Trading Defendants (defined *infra* at 43) were

lining their own pockets through suspiciously well-timed selling of more than $11 million of Baxter shares. In addition, the Defendants approved, participated in and/or acquiesced to numerous "self-dealing" transactions.

16.     In this manner, the Defendants' wrongful conduct has damaged Baxter's market value, resulted in approximately $1 billion in writedowns, and exposed the Company to continuing substantial liability. Baxter faces many millions of dollars in litigation expenses and potential civil judgments resulting from the Heparin contamination, injuries and deaths suffered from its defective Colleague pumps, and the securities cases arising from its false statements in SEC filings. Baxter has also suffered severe damage to its reputation, goodwill and investor confidence. This shareholder derivative action, commenced by a significant and long-term institutional investor of Baxter, seeks to remedy the breaches of fiduciary duties and waste of corporate assets occasioned by the Defendants' dereliction of duty.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has jurisdiction over each of the Defendants named herein because they conduct business in, reside in and/or are citizens of Illinois. Certain Defendants are citizens of Illinois, including Baxter, which has its principal place of business in this state and in this County.

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein occurred in this District and one or more of the Defendants either resides or maintains executive offices in this District.

## PARTIES

7

Plaintiff

20.     Plaintiff Westmoreland County Employee Retirement System, based in Greensburg, Pennsylvania, has been an owner and holder of Baxter common stock continuously since September 5, 2006.  It currently holds approximately 15,900 shares.

Nominal Defendant

21.     Nominal Defendant Baxter is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located at One Baxter Parkway, Deerfield, Illinois.

Director Defendants

22.     Baxter directors receive generous incentive packages designed to ensure their loyalty and fidelity to Baxter and its shareholders.  In calendar year 2009, each non-executive director received an annual cash retainer of $65,000.  In addition to the annual retainer, non-executive directors who serve as committee chairs received a retainer for such service in the amount of $1,500 for each meeting chaired.  The lead independent director received an additional retainer of $30,000 per year.  Non-executive directors also received $1,500 for each Board committee meeting they attended, or $3,000 for attending a Science and Technology Committee meeting.

23.     In addition, each non-employee director is entitled to receive a yearly stock option grant on the date of the annual meeting of shareholders.  Under Baxter's director compensation plan, the value of the annual stock option grant to each non-employee director is $65,000. The options become exercisable on the date of the next annual meeting of shareholders.

24.     Each non-employee director also receives an annual grant of restricted stock units on the date of the annual meeting of shareholders. The number of restricted stock units equals the quotient of $65,000 divided by the closing sale price for a share of Baxter common stock on the date

of the annual meeting. The restricted stock units vest on the date of the next annual meeting of shareholders.

25.    Defendant Walter E. Boomer ("Boomer") has served as a director of the Company since 1997. Defendant Boomer's total annual compensation for his Board membership for the year ended December 31, 2009 was $239,342.

26.    Defendant Blake E. Devitt ("Devitt") has served as a director of the Company since 2005. Defendant Devitt's total annual compensation for his Board membership for the year ended December 31, 2009 was $241,342.

27.    Defendant John D. Forsyth ("Forsyth") has served as a director of the Company since 2003. Defendant Forsyth's total annual compensation for his Board membership for the year ended December 31, 2009 was $218,342.

28.    Defendant Gail D. Fosler ("Fosler") has served as a director of the Company since 2001. Defendant Fosler's total annual compensation for her Board membership for the year ended December 31, 2009 was $222,842.

29.    Defendant James R. Gavin III ("Gavin") has served as a director of the Company since 2003. Defendant Gavin's total annual compensation for his Board membership for the year ended December 31, 2009 was $217,384.

30.    Defendant Peter S. Hellman ("Hellman") has served as a director of the Company since 2005. Defendant Hellman's total annual compensation for his Board membership for the year ended December 31, 2009 was $200,782.

31.    Defendant Wayne T. Hockmeyer ("Hockmeyer") has served as a director of the Company since 2007. Defendant Hockmeyer's total annual compensation for his Board membership for the year ended December 31, 2009 was $226,842.

32. Defendant Joseph B. Martin ("Martin") has served as a director of the Company since 2002. Defendant Martin's total annual compensation for his Board membership for the year ended December 31, 2009 was $215,342.

33. Defendant Carole J. Shapazian ("Shapazian") has served as a director of the Company since 2003. Defendant Shapazian's total compensation for her Board membership for the year ended December 31, 2009 was $220,342. In addition, during the Relevant Period, Shapazian made insider trades of at least 5,760 artificially-inflated shares of her personal Baxter stock for proceeds of over $323,000.

34. Defendant Thomas T. Stallkamp ("Stallkamp") has served as a director of the Company since October 2000. Defendant Stallkamp's total compensation for his Board membership for the year ended December 31, 2009 was $222,842. In addition, during the Relevant Period, Stallkamp made insider trades of at least 20,590 artificially-inflated shares of his personal Baxter stock for proceeds of over $1.2 million.

35. Defendant K. J. Storm ("Storm") has served as a director of the Company since 2003. Defendant Storm's total annual compensation for her Board membership for the year ended December 31, 2009 was $233,342.

36. Albert P.L. Stroucken ("Stroucken") has served as a director of the Company since 2004. Defendant Stroucken's total annual compensation for his Board membership for the year ended December 31, 2009 was $224,342.

37. Defendant Robert L. Parkinson, Jr. ("Parkinson") serves as Chairman of the Board, President, and CEO of Baxter. Parkinson assumed his role as Chairman, CEO and President in February 2004. Parkinson has been compensated handsomely during his tenure at Baxter, having been paid over $48 million during fiscal years 2007-2009 alone:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Pension/ Other Deferred Compensation Accruals | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|-----------------------------------------------|------------------------|-------|
| 2009 | $1,342,000 | $4,785,304 | $2,982,046 | $2,500,560 | $2,518,252 | $233,143 | $14,361,305 |
| 2008 | 1,339,339 | 6,084,226 | 3,569,053 | 2,708,940 | 910,946 | 212,326 | 14,824,830 |
| 2007 | 1,296,153 | 7,604,400 | 4,852,681 | 3,000,000 | 2,288,783 | 153,158 | 19,195,175 |
| | | | | | | | $48,381,310 |

Officer Defendants

38.     Defendant Robert M. Davis ("Davis") served as Baxter's Corporate Vice President and Chief Financial Officer from 2006 until June 2010.  Davis is currently President of the Renal Division.  Davis has been compensated handsomely during his tenure at Baxter, having been paid over $11 million during fiscal years 2007-2009 alone:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Pension/ Other Deferred Compensation Accruals | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|-----------------------------------------------|------------------------|-------|
| 2009 | $576,923 | $1,066,887 | $668,147 | $814,320 | $115,023 | $101,027 | $3,342,327 |
| 2008 | 554,769 | 1,282,296 | 711,463 | 866,320 | 68,406 | 90,873 | 3,574,127 |
| 2007 | 506,615 | 1,848,624 | 970,536 | 793,585 | 46,812 | 58,591 | 4,224,763 |
| | | | | | | | $11,141,217 |

39.     Defendant Norbert G. Riedel ("Riedel") serves as Baxter's Corporate Vice President and Chief Scientific Officer.  Riedel assumed his role in March 2001.  On December 2, 2009 and March 5, 2010, Defendant Riedel sold 168,100 shares of his personal holdings in Baxter stock, while the stock was artificially inflated.  Riedel knew it was artificially inflated due to the false statements made by the Defendants in their SEC filings and earnings reports.  Reidel's proceeds from insider sales exceeded $9.6 million.

40.     Defendant Joy A. Amundson ("Amundson") is Corporate Vice President and President of Baxter's BioScience division.  Amundson has been compensated handsomely during her tenure at Baxter, having been paid over $11.7 million during fiscal years 2007-2009 alone:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Pension/ Other Deferred Compensation Accruals | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2009 | $576,923 | $1,066,887 | $668,147 | $814,320 | $204,514 | $102,944 | $3,433,735 |
| 2008 | 554,769 | 1,282,296 | 711,463 | 866,320 | 141,384 | 109,065 | 3,665,297 |
| 2007 | 523,077 | 2,063,706 | 970,536 | 917,410 | 112,036 | 94,119 | 4,670,884 |
| | | | | | | | $11,769,916 |

41.     Defendant Peter J. Arduini ("Arduini") was the Corporate Vice President and President of Baxter's Medication Delivery division until October 2010.  Arduini had been compensated handsomely during his tenure at Baxter, having been paid over $10.5 million during fiscal years 2007-2009 alone:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Pension/ Other Deferred Compensation Accruals | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2009 | $545,538 | $977,980 | $612,468 | $723,840 | $82,184 | $89,617 | $3,029,627 |
| 2008 | 526,923 | 1,282,296 | 711,463 | 527,760 | 77,797 | 96,973 | 3,223,122 |
| 2007 | 505,692 | 1,966,407 | 970,536 | 692,230 | 69,352 | 86,529 | 4,290,746 |
| | | | | | | | $10,543,495 |

42.     The Director Defendants consist of those listed in ¶¶22-37.  The Officer Defendants consist of those listed in ¶¶37-41.

43.     The Insider Trading Defendants are Directors Shapazian and Stallkamp, and Officer Reidel.

Audit Committee

44.     The Baxter Board has an Audit Committee, which was comprised of Defendants Devitt (Chair), Fosler, Stallkamp, Storm and Stroucken during the Relevant Period.  According to Baxter's Proxy Statement on Schedule 14A, filed with the SEC on March 19, 2010, the Audit Committee is primarily concerned with the integrity of Baxter's financial statements, system of internal accounting controls, the internal and external audit process, and the ***process for monitoring compliance with laws and regulations***.  Its duties include: (1) reviewing the adequacy and

effectiveness of Baxter's internal controls over financial reporting with management and the independent and internal auditors, and reviewing with management Baxter's disclosure controls and procedures; (2) retaining and evaluating the qualifications, independence and performance of the independent registered public accounting firm; (3) approving audit and permissible non-audit engagements to be undertaken by the independent registered public accounting firm; (4) reviewing the scope of the annual internal and external audits; (5) reviewing and discussing earnings press releases prior to their release; (6) holding separate executive sessions with the independent registered public accounting firm, the internal auditor and management; and (7) discussing guidelines and policies governing the process by which Baxter assesses and manages risk. The Audit Committee met 11 times in 2009.

Public Policy Committee

45.     The Baxter Board has a Public Policy Committee, which was comprised of Defendants Hockmeyer (Chair), Boomer, Gavin, Martin and Shapazian during the Relevant Period. According to Baxter's Proxy Statement on Schedule 14A, filed with the SEC on March 19, 2010, the Public Policy Committee is primarily concerned with the review of the policies and practices of Baxter to ensure that they are consistent with Baxter's social responsibility to act with integrity as a global corporate citizen to employees, customers and society. The Public Policy Committee's duties include: (1) addressing the Company's responsibilities with respect to the health and safety of employees, consumers and the environment; (2) overseeing, reviewing and making recommendations to the Corporate Responsibility Office as set forth in the Company's Code of Conduct; (3) *reviewing and making recommendations regarding Baxter's Quality and Regulatory programs and performance*; and (4) reviewing and making recommendations on the Company's Government Affairs Program, including the Company's political contributions and positions with

respect to pending legislative and other initiatives, and political advocacy activities. The Public Policy Committee met three times in 2009.

Science and Technology Committee

46.     The Baxter Board has a Science and Technology Committee, which was comprised of Defendants Martin (Chair), Gavin, Hockmeyer and Shapazian during the Relevant Period. According to Baxter's Proxy Statement on Schedule 14A, filed with the SEC on March 19, 2010, the Science and Technology Committee was formed in May 2009 to review and assist in the oversight of Baxter's long-term research and development ("R&D") strategies and objectives, R&D pipeline and technology platforms. The Science and Technology Committee is also responsible for identifying and discussing significant emerging issues and trends in science and technology applicable to the Company's business. The Science and Technology Committee met for two extended sessions in 2009.

## DEFENDANTS' FIDUCIARY DUTIES

47.     By reason of their positions as officers, directors and/or fiduciaries of Baxter, and because of their ability to control its business and corporate affairs, the Defendants who were officers, employees or directors of Baxter owed the Company and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Baxter and its shareholders so as to benefit all shareholders equally and *not* in violation of law or in furtherance of their personal interest or benefit.

48.     Each Defendant owed to Baxter the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property

and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information, and not to advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

49.     The Defendants, who were officers or directors of Baxter, because of their positions of control and authority, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Baxter, each of the Defendants who were officers or directors of Baxter had access to all non-public information about the operations and future business prospects of the Company.

50.     At all times material hereto, each of the Defendants was the agent of each of the other Defendants and of Baxter, and was at all times acting within the course and scope of said agency.

51.     To discharge their duties, the officers and directors of Baxter were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the governance, financial and operational affairs of the Company. By virtue of such duties, the officers and directors of Baxter were required, among other things, to:

        (a)     manage, conduct, supervise and direct the business and internal affairs of Baxter in accordance with the law of the State of Delaware, federal law, state and federal rules and regulations and the Company's charter and bylaws;

        (b)     neither violate nor knowingly permit any officer, director or employee of Baxter to violate applicable laws, rules and regulations;

        (c)     remain informed as to the status of Baxter's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection

15

therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable law;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Baxter and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial and operational controls, such that Baxter's information disseminated to the public would be accurate and the actions of its directors would be in accordance with all applicable law;

(f)     exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Baxter by its officers and employees; and

(g)     preserve the assets of Baxter to the detriment of their fellow executives and directors of Baxter.

### CONSPIRACY, AIDING
### AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

53.     The name of each person and/or entity who is responsible for, participated in, conspired to bring about, or substantially and knowingly aided and abetted the self-dealing and illegal actions complained of herein, is set forth in the caption of this Complaint.  Baxter's Board operated as a collective entity through periodic meetings held either in person or telephonically

where the Board discussed matters affecting the Company's business and reached collective and consensual decisions as to what action to take.

54.     Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  The Defendants' acts of aiding and abetting include, *inter alia,* the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

55.     Plaintiff brings this action derivatively in the right and for the benefit of Baxter to redress injuries suffered and to be suffered by Baxter as a direct and proximate result of the breaches of fiduciary duties, violations of law, abuse of control, gross mismanagement and waste of corporate assets, as well as the aiding and abetting thereof, by the Defendants.

56.     Plaintiff will adequately and fairly represent the interests of Baxter and its shareholders in enforcing and prosecuting its rights.

57.     Plaintiff is the owner of Baxter stock and was an owner of Baxter stock during all times relevant to the Defendants' illegal and wrongful course of conduct alleged herein.

58.     During the illegal and wrongful course of conduct at the Company and through the present date, the Baxter Board consisted of Defendants Boomer, Devitt, Forsyth, Fosler, Gavin, Hellman, Hockmeyer, Martin, Parkinson, Shapazian, Stallkamp, Storm and Stroucken.  As a result of the facts set forth throughout this Complaint, pursuant to the laws of Baxter's state of

incorporation, demand on the Baxter Board to institute this action against the officers of Baxter and members of the Baxter Board was not necessary because such a demand would have been a futile and useless act, particularly for the following reasons:

(a)     Each director of Baxter knowingly participated in, approved and permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Baxter's stockholders and were therefore not disinterested parties;

(b)     The acts complained of include the knowing approval of violations of state and federal law and breaches of the fiduciary duties owed by Baxter's officers and directors and these acts were incapable of ratification;

(c)     The Audit and Finance Committee was comprised of ***Devitt, Fosler, Stallkamp, Storm*** and ***Stroucken*** during the Relevant Period. In derogation of their duties, these Defendants failed to oversee the adequacy and effectiveness of Baxter's internal controls over financial reporting, because, as described herein, Baxter's financial statements and reports: (i) concealed from investors the material fact that the failure of a proposed merger between Baxter's two largest competitors in the plasma-derived therapies market was resulting in increased supplies of plasma-based products and increased pricing pressure, which was adversely affecting Baxter's margins; (ii) failed to disclose observed negative trends and uncertainties related to the market for Baxter's plasma-derivative products, including that the boost in market share and gross profit margin Baxter had experienced while the merger was pending was only temporary; (iii) misstated Baxter's revenue guidance for 2010 related to the Company's plasma-based products and BioScience division as a whole; (iv) concealed the fact that the Company's operational controls over the quality of its products were inadequate and that the Company was continuing to sell untested products that exposed it to substantial risk of product liability litigation; (v) concealed the fact that Baxter was not

18

complying with the Consent Decree with the FDA concerning its Colleague Infusion Pumps and that the failure to do so could have a materially adverse effect on Baxter's finances; and (vi) misrepresented that the Company had adequate controls over timely and truthful reporting of material events and the ability to handle its operations;

(d)     The Public Policy Committee was comprised of ***Hockmeyer, Boomer, Gavin, Martin*** and ***Shapazian*** during the Relevant Period.  In derogation of their duties, these Defendants failed to address the Company's responsibilities with respect to the health and safety of consumers and failed to make sound, independent recommendations to the Company regarding Baxter's quality and regulatory programs and performance. As reported in the FDA's May 3, 2010 News Release, the FDA had been working with Baxter since 1999 to correct numerous device flaws in the Company's Colleague Infusion Pumps. Since 1999, Colleague Infusion Pumps have been the subject of several recalls for battery swelling, inadvertent power off, service data errors, and other issues.  Since entering the Consent Decree in 2006 (during which time Boomer, Martin, Gavin and Shapazian were all directors of Baxter), Baxter failed to correct the product defects, leading to the permanent injunction in the Consent Decree. On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that Baxter did not plan to even begin the latest round of corrections to the adulterated and misbranded pumps until May 2012. The proposal also stated that Baxter did not anticipate completion of the proposed corrections until 2013. In response, the FDA rejected Baxter's proposal, stating, "***[o]n that schedule, a device with known safety concerns would remain in use on patients needing specialized care until 2013.***"  The FDA then ordered the recall and destruction of ***all*** Colleague Infusion Pumps and the replacement or payment of replacement costs for the approximately 200,000 users in the U.S.;

(e)     The Science and Technology Committee was comprised of ***Martin, Gavin,***

19

*Hockmeyer* and *Shapazian* during the Relevant Period. In derogation of their duties, these Defendants failed to oversee Baxter's long-term R&D strategies and objectives. With full knowledge of the June 2006 Consent Decree (Martin, Gavin and Shapazian were all directors of Baxter when the Company entered the Consent Decree with the FDA), these Defendants allowed remediation of the Colleague Infusion Pump to languish. Under their watch, Baxter submitted a proposed correction schedule to the FDA that stated that Baxter did not plan to begin the latest round of corrections to the adulterated and misbranded Colleague Infusion Pump until May 2012 and did not anticipate completion of the proposed corrections until 2013. All the while, the faulty pumps would remain in use on patients. Given that the FDA had "received more than 56,000 reports of adverse events associated with the use of infusion pumps," which included more than "500 deaths," such a proposal was patently ridiculous, and doomed Baxter to hundreds of millions of dollars in recall charges;

(f)     Defendants *Boomer, Devitt, Forsyth, Fosler, Gavin, Hellman, Martin, Shapazian, Stallkamp, Storm* and *Stroucken* were all directors of Baxter when the Company entered the June 2006 Consent Decree with the FDA and thus had full knowledge of the undisclosed issues regarding the Company's Colleague Infusion Pumps. Indeed, the Board is charged with overseeing the operational and regulatory risk management activities of Baxter. According to Baxter's Proxy Statement on Schedule 14A, filed with the SEC on March 19, 2010, regulatory risks are provided at least annually to the full Board. Despite knowledge of the numerous flaws with the Colleague Infusion Pump, these Defendants breached their duty to see that initiatives were put in place to correct the issues with the Colleague Infusion Pump or to, at the very least, pull this product, which had known safety concerns, from use in the patient population;

(g)     Despite knowledge that Baxter's financial statements and reports: (i)

concealed from investors the material fact that the failure of a proposed merger between Baxter's two largest competitors in the plasma-derived therapies market was resulting in increased supplies of plasma-based products and increased pricing pressure; (ii) failed to disclose observed negative trends and uncertainties related to the market for Baxter's plasma-derivative products, including that the boost in market share and gross profit margin Baxter had experienced while the merger was pending was only temporary; (iii) misstated Baxter's revenue guidance for 2010 related to the Company's plasma-based products and BioScience division as a whole; (iv) concealed the fact that Baxter was not complying with the Consent Decree with the FDA concerning its Colleague Infusion Pumps; and (v) misrepresented that the Company had adequate controls over timely and truthful reporting of material events and the ability to handle its operations; Defendants **Shapazian, Stallkamp and Reidel** continued to sell Baxter stock at prices inflated by the market's ignorance of the true state of affairs at Baxter;

(h)     Baxter was, and continues to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Baxter any part of the damages Baxter has suffered and will suffer in the future;

(i)     If the directors were to have commenced this action against themselves, they would have exposed their own knowing misconduct and complicity, which admissions would have impaired their defenses in any civil actions brought against them and greatly increased the probability of their personal liability therein, for which insurance coverage would be unavailable to the Defendants; and

(j)     Each director was, directly or indirectly, the recipient of handsome remuneration paid by the Company, the continuation of which was dependent upon their continued

cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein.

59.     In addition to the Demand Futility Allegations set forth in paragraphs 55 to 58, the Plaintiff makes further particularized allegations based upon a review of Company meeting minutes obtained pursuant to an 8 Del. C. §220 books and records request.  These records demonstrate that

REDACTED

REDACTED

REDACTED.

| Entity Meeting | Date | Topic Discussed |
|---|---|---|
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |

| REDACTED | REDACTED | REDACTED |
|---|---|---|
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED |
| REDACTED | | |

60.     Redacted copies of these meeting minutes, which were produced by Baxter pursuant to a Delaware Corporation Law, 8 Del. C. § 220, books and records request, are attached hereto as Exhibit C1-C59.[1]

61.     The Director Defendants discussed numerous times at the afore-referenced Board meetings the Company's obligations under the 2006 Consent Decree, the continuing problems with the pumps, and the damage the Company was suffering and would continue to experience if they did not take prompt, effective action.  While a typical corporate board might plausibly claim ignorance

---

[1] Unredacted copies of Exhibits C1-C59 will be filed with the Court under seal pursuant to Local Rule No. 5.8.

concerning compliance failures in general, in this case Baxter's Board was made specifically and uniquely accountable under the Consent Decree for monitoring, ensuring and enforcing the Company's compliance with FDA regulations, and its remediation efforts with respect to the Colleague pumps. Indeed, the Consent Decree and the long-standing problems with the pumps, in conjunction with the continuing write-offs associated therewith ($27 million, $125 million, $14 million, $94 million, and $77 million in 2009, 2008, 2007, 2006 and 2005, respectively), plainly put the entire Board on notice, and if they did not have actual knowledge, the lack thereof constitutes a bad faith breach of their duties.

62.     Given that each Director Defendant had knowledge of the damages that would be caused by the Company's violation of the 2006 Consent Decree, they had a duty to act upon this information and to protect the Company from continuing to violate FDA policies and the Consent Decree. Their failure to do so has damaged the Company. Concomitantly, the failure of the Director Defendants to disclose to shareholders that Baxter was not complying with the Consent Decree caused the market price of its stock to be artificially inflated, and shareholders suffered substantial losses once the truth became known. Defendants' omissions have caused the Company to be sued for securities fraud. As a result, each of the Directors faces a substantial likelihood of liability for his/her conduct and demand is, therefore, excused.

63.     The Director Defendants' breaches of fiduciary duty are even more striking with respect to those Directors who served on the Audit and Public Policy Committees. Despite being charged with "addressing the Company's responsibilities with respect to the health and safety of employees, *consumers* and the environment," and "reviewing and making recommendations regarding Baxter's Quality and Regulatory programs and performance" in the case of the Public Policy Committee, and "discussing guidelines and policies governing the process by which Baxter

assesses and manages risk," in the case of the Audit Committee and engaging in robust discussions at both committee meetings that put the Directors on direct notice that the Company had no intention of complying with its obligations under the 2006 Consent Decree, these committee members failed to take timely, effective action sufficient to meet the FDA's demands, and continued to put the health and safety of Baxter consumers at risk.

64. As a direct and proximate result of the Director Defendants' "longstanding failure to correct many serious problems with the pumps," the FDA ordered the Company to "recall and destroy all of its Colleague Volumetric Infusion Pumps … currently in use in the United States." May 3, 2010 FDA Press Release. Defendants' actions (or more accurately inaction) damaged the Company's reputation and stock price, and resulted in a charge of $588 million related to the 2010 recall. *A fortiori,* demand is excused with respect to these directors.

65. For the foregoing reasons, there is a reasonable doubt that the members of the Audit Committee (Devitt, Foster, Stallkamp, Storm and Stroucken), and the members of the Public Policy Committee (Hockmeyer, boomer, Gavin, Martin and Shapazian), and the CEO director, Parkinson: (i) are disinterested and independent; or (ii) their conduct, which is at issue here, was otherwise the product of valid business judgment.

## FACTUAL ALLEGATIONS

A.    Heparin Contamination

66. Heparin is a prescription drug in a class of medications called anticoagulants. Anticoagulants is a blood thinner, used primarily to decrease the chance of blood clots forming in patients undergoing certain medical procedures such as surgeries or dialysis and is also used for other conditions such as pulmonary emboli.

67. The active pharmaceutical ingredient ("API") in Heparin is an enzyme that is extracted from pig intestines, cooked, and then purified using complex purification processes such as

factional prescription, purification and chemical treatments.

68.     In 2008, Baxter sold approximately half the vials of Heparin in the United States. Baxter obtained the component parts for its Heparin product from a supplier, Scientific Protein Laboratories LLP ("SPL"). The Defendants knew had its manufacturing plant in Changzhou, China.

69.     Upon information and belief, the Changzhou manufacturing plant obtained the API for the Heparin from entirely unregulated and often unclean multiple, small, family-owned workshops that failed to process the crude Heparin effectively, resulting in a dangerous product, containing animal cartilage, that contaminated the API.

70.     Meanwhile, the Defendants warranted and represented to its customers and investors that Baxter:

> (a)    "places a significant emphasis on providing quality products and services to its customers;"
>
> (b)    in "an effort to manage risks associated with raw material supply, **_Baxter works closely with its suppliers_** to ensure availability and continuity of supply while maintaining high quality and reliability;"
>
> (c)    that "**_great care is taken in assuring the safety of raw materials_**;"
>
> (d)    that it "**_regularly reviews its quality systems_** to determine their effectiveness and identify areas for improvements"; and
>
> (e)    that it "**_performs assessments of its suppliers of raw materials_**, components and finished goods."

February 28, 2008 SEC 10-K (emphasis added).

71.     The Defendants continued to make similar warranties and representations in 2008. As set forth in its 10-K filing on February 26, 2008, Baxter represented:

(a) "*Quality management plays an essential role* in determining and meeting customer requirements, preventing defects and improving the Company's products and services."

(b) "*Baxter has a network of quality systems throughout the Company's business units and facilities* which relate to the design, development, manufacturing, packaging, sterility action, handling, distribution and labeling of the Company's products;" and

(c) *"Baxter also performs assessments of its suppliers of raw materials*, components and finished goods."

February 28, 2008 SEC 10-K (emphasis added).

72. The above representations of the importance of quality control over its suppliers were false and were known by the Defendants to be false when the statements were made.

73. Baxter never even made one inspection, let alone a visit to the manufacturing plant in Changzhou, China and never took any other effective action to verify the purity of the API of its Heparin product which was essential to the health and safety of millions of patients.

74. Nevertheless, the Defendants allowed Baxter to supply and sell the Heparin to the unsuspecting public without providing any warning and to tout its quality control measures to its patients and investors which it knew were not true. Moreover, the risk to Baxter's profitability from undertaking such an inherently reckless policy was enhanced since Baxter was and continues to be self-insured with respect to product liability claims. February 23, 2010 SEC 10-K.

75. Upon information and belief, the Defendants became aware of severe allergic reactions experienced by patients who were using Baxter's Heparin in early 2007, but continued to misrepresent the safety of its products to patients and investors.

76.     Finally, on January 17, 2008, Baxter announced a recall of nine lots of Heparin because the unusual number of adverse patient's reactions became too great to ignore.  The adverse reactions included extreme nausea, vomiting, breathing difficulty, excessive sweating, decreased blood pressure, severe hypertension and in some cases lead to death.

77.     On February 11, 2008, Baxter and the FDA expanded the recall of lots of its multiple dose vials.  Several additional recalls followed.

78.     The FDA announced on March 19, 2008 that it had identified the contamination as over-sulfated chondroitin sulfate and found this contamination in significant quantities of samples that were collected from SPL's Chanzhou plant.

79.     The Heparin contamination garnered substantial publicity in the general press and television media throughout the summer and fall of 2008.

80.     On November 19, 2008, United States Congressman Joe Barton of Texas wrote to the Governmental Accountability Office demanding a thorough investigation into the manner in which the FDA and Baxter handled the Heparin contamination.  The Barton letter excoriated the FDA and Baxter for not coming clean about the actual number of Heparin-related deaths and the poor follow through of the investigation.

81.     Baxter stock got pummeled when the extent of its mishandling of the Heparin contamination and the truth about its dearth of quality control over its manufacturing operations was revealed.  Opening at $57.07 per share on November 19, 2008, Baxter stocks closed at $48.50 per share on November 20, 2008, a drop of approximately 15% on heavy trading.

B.     Baxter's Plasma-Based Products Business

82.     Baxter, through its subsidiaries, develops, manufactures and markets products for patients with hemophilia, immune disorders, infectious diseases, kidney disease, trauma, and other chronic and acute medical conditions.  The Company's products are used by hospitals, kidney

28

dialysis centers, nursing homes, rehabilitation centers, doctors' offices, clinical and medical research laboratories and by patients at home under physician supervision.

83.     Of Baxter's three divisions, the BioScience segment is its largest.  In 2009, Baxter derived over 44% of its revenue from this segment.  A primary business within the BioScience division involves the refining of donated plasma to make products that treat problems such as immune-system disorders and hemophilia.  Baxter is the largest supplier of such plasma-based therapies in the world.  The Company's plasma-based products business, including intravenous immune globulin ("IVIG") antibody therapy products, constituted 22% of Baxter's total sales in 2009 and, as such, is of great importance to investors. In recent years, price increases related to IVIG products have driven much of the growth in the Company's earnings.

84.     In 1990, there were thirteen producers of plasma-based products.  Over time the market consolidated and by 2008 there were only five producers of plasma-derivative products, with three of the producers -- Baxter, CSL Limited ("CSL") and Talecris Biotherapeutics ("Talecris") -- controlling over 80% of the market.

85.     In 2008, Talecris, the third largest supplier of plasma-based products, experienced certain manufacturing disruptions, including a shortfall in supply.  Baxter benefitted from the supply constraint by gaining market share and by enjoying increases in the price of plasma products. In the meantime, Talecris announced plans to aggressively expand its production capacity in late 2008 and 2009.  Prior to Talecris implementing its planned expansion, CSL, the second largest supplier of plasma-based products, entered an agreement to acquire Talecris for $3.1 billion in August 2008.

86.     On May 27, 2009, the Federal Trade Commission ("FTC") filed a lawsuit to block CSL's proposed acquisition of Talecris on the basis that the merger would be anticompetitive and would violate federal antitrust laws.  According to the FTC complaint, the industry already operated

"as a tight oligopoly, with a high level of information sharing and interdependence among firms." Producers in the industry had for years realized that they could maximize profits by restricting the supply of plasma-based products and raising prices. The FTC believed that the acquisition of Talecris would effectively eliminate the only significant threat to the "durable and highly profitable oligopoly."

87.     As a result of the FTC's lawsuit, CSL abandoned its plans to acquire Talecris on June 9, 2009. After the abandonment of the merger, Talecris subsequently returned to full production in its supply of plasma-based products to the market.  Thus, the Defendants knew by the summer of 2009 that the temporary boost the Company had enjoyed while the merger was pending had come to an end.

88.     On July 15, 2009, Pemiscot Memorial Hospital initiated a class action suit against Baxter and CSL alleging that the two companies had created an illegal plasma cartel to engage in a conspiracy to fix the price of plasma-based products by restricting the supply of plasma, inflating the price of the derived products and eliminating competition.  By February 2010, eighteen other plaintiffs had joined the class action lawsuit against Baxter and CSL, including the Mayo Clinic, one of the United States' most prestigious and well-funded hospitals.

89.     The Defendants knew that these factors would adversely affect Baxter's ability to maintain high prices for its plasma-based products and its market share in the plasma-derived therapies market.

C.     Background – Baxter's Colleague Infusion Pumps

90.     Baxter's Medication Delivery segment manufactures and sells electronic infusion pumps that deliver intravenous fluids such as medication or nutrients to patients.  Baxter began selling its Colleague Infusion Pumps in the mid-1990s.  Due to numerous design deficiencies, the

Colleague pumps came under scrutiny by the FDA beginning in 1999.

91.     The FDA issued Baxter multiple warning letters as a result of the Company's consistent failure to comply with applicable standards.  Baxter nevertheless still failed to comply. Accordingly, on October 12, 2005, the FDA filed a verified complaint seeking the forfeiture of all Baxter-owned Colleague pumps.  Baxter and defendant Parkinson were among those named as defendants by the government.  On the same day the government filed the complaint, the court issued, and the government executed, a Warrant of Seizure and Monition for the approximately 6,000 Baxter-owned Colleague pumps held at Baxter's two manufacturing facilities.

92.     On October 26, 2005, the government filed an amended *in rem* complaint with substantially similar allegations as those set forth in the October 12, 2005 complaint.   The government alleged, among other things, that the pumps were misbranded within the meaning of the Federal Food, Drug and Cosmetic Act ("FDCA") and that Baxter failed or refused to furnish information as required by the FDCA.

93.     On June 29, 2006, the FDA announced that the Company and the defendants, including defendant Parkinson, had entered into a Consent Decree of Condemnation and Permanent Injunction, which was approved by the Court.  Pursuant to the June 2006 Consent Decree, the FDA forced Baxter to stop selling Colleague Infusion Pumps in the U.S. market.

94.     The Consent Decree provided, in relevant part:

Within twenty (20) calendar days after entry of this decree, Defendants shall submit to FDA in writing a detailed Corrective Action Plan to bring the Infusion Pumps currently in use in the United States by physicians, hospitals, pharmacies, and other users/facilities into compliance with the Act, its implementing regulations, and this decree.

*       *       *

Defendants shall commence the implementation of the Corrective Action Plan within thirty (30) calendar days of receiving FDA's written authorization. Defendants shall, beginning one month after the date on which implementation of the Corrective

Action Plan has begun, and continuing until its completion, submit to FDA monthly written progress reports updating the status of the Corrective Action Plan. Defendants shall use their best efforts to locate all Infusion Pumps in use by health care professionals in the United States and to obtain the cooperation of such users to implement the corrective actions required by this paragraph.

*     *     *

If, at any time after this decree has been entered, FDA determines, based on the results of an inspection, sample analysis, a report or data prepared or submitted by Defendants, the Expert, or the Auditor pursuant to this decree, or any other information, that Defendants have failed to comply with any provision of this decree, or have violated the Act or its regulations, or that additional corrective actions are necessary to achieve compliance with this decree or the Act, FDA may, as and when it deems necessary, order Defendants in writing to … recall, at Defendants' sole expense, specified adulterated or misbranded Infusion Pumps manufactured, distributed, or sold by Defendants or that are under the custody and control of Defendants' agents, distributors, customers, or consumers.

95.     In 2008 alone, Baxter recorded charges totaling $125 million ($53 million in the first quarter and $72 million in the third quarter) related to issues associated with Colleague Infusion Pumps. From 2005 through 2007, the Company recorded charges and other costs totaling $185 million related to Colleague Infusion Pumps and Syndeo infusion pumps (also subject to the Consent Decree).

D.     <u>Baxter's False and Misleading Representations to the Public During the Relevant Period</u>

96.     On September 16, 2009, Baxter hosted an Investor Conference ("September 2009 Investor Conference") for analysts, media representatives and investors. In conjunction therewith, the Company issued a press release highlighting discussion points for its September 2009 Investor Conference, which stated in part:

> Over its five-year long-range plan period, ***Baxter expects to increase sales approximately 7 to 8 percent*** (excluding the impact of foreign currency), ***grow earnings per share in the 11 to 13 percent range***, and generate strong annual cash flow of approximately $4 billion by the year 2014. The company also plans to continue focusing on innovation and expanding its robust pipeline by increasing investments in R&D at a compounded annual rate of at least 8 to 10 percent.

> "We remain committed to transforming our culture to one with a sustained focus on

32

innovation and demonstrating the value of our products and therapies through clinical differentiation," says Robert L. Parkinson, Jr., chairman and chief executive officer. "We believe we have a balanced outlook and are well-positioned to achieve our results while making appropriate investments to enhance future growth and delivering value to shareholders."

\*　　\*　　\*

"We remain focused on delivering growth and achieving our long-term objectives," says Robert M. Davis, corporate vice president and chief financial officer. "Our financial performance and disciplined approach toward capital allocation allow us to provide an attractive return to our shareholders while expanding our innovative pipeline and global presence.

(Emphasis added).

97.　　Defendants Parkinson, Davis, Riedel and Arduini participated in the September 2009

Investor Conference. During the conference, these Defendants repeatedly assured investors of the

Company's ability to meet its long-range plan, including making the following statements:

In BioScience, we expect revenue growth of 7 to 9% as we focus on improving access to care and standards of care and drive differentiated value with expanded indications and the development of new therapies.

\*　　\*　　\*

We expect to see continued gross margin expansion across all businesses and regions over the Long-Range Plan. *One of the most frequently asked questions we receive is, given the improvement in gross margin is the margin sustainable and can it expand even further? Well, the answer is yes.* As we've frequently mentioned, there are a number of levers that will drive meaningful gross margin expansion over the Long-Range Plan.

\*　　\*　　\*

*Margin improvement has largely been driven by the strength of our BioScience business, which has been our largest and fastest growing business and is also the highest margin business in the company*. Another question we frequently receive from investors is in regard to price improvement and the impact that they've had on our gross margin improvement. We believe many investors focus on this given the recovery we've experience[d] in the plasma market over the last several years, without fully appreciating the breadth and depth of other margin drivers such as improved product mix, product upgrades, lower cost and improved yield. While price alone has accounted for approximately 25% of the company's overall percentage margin improvement since 2006, other catalysts drove approximately 75% of that change as we've reached the margin of over 50% in 2008.

33

*       *       *

[Analyst:] Okay. And last just to make sure I understood what you were saying about Colleague, it sounds like you are hoping to fully resolve or if I remember correctly early 2010 [sic]. Maybe just remind us one, what's left to do to get it fully resolved and added, and two, what should we expect commercially once that's done? I mean and what's assumed in the plan as we see some surge in sales, those people have been waiting or what do we expect? Thank you.

[Defendant Parkinson:] *I mean we continue with the remediation efforts. We have remediated well over 100,000 devices in the U.S. We continue to work with the FDA on how we move forward and complete that remediation.*

*There has been a number of things that as we have conducted the remediation that was a basis of some follow-on field corrective actions that we announced earlier in the year, that we still need to get, we still need to get tied down, which we're hopeful that we can get that resolved certainly in 2010.*

What Pete [Arduini, Baxter Corporate Vice President – President, Medication Delivery] pointed out in his presentation is Colleague was first launched in the U.S. market in what about '96, '97, something like that. So this is well over 10, 12-year-old device that [h]as Pete pointed out in his presentation doesn't have if not a smartphone, but doesn't include a lot of the technology that's represented in many of the devices, including the Sigma device that we did the deal on and what's reflected in our next generation products.

So the position we are in now, as we want to complete the remediation of Colleague. We want to understand how our promotional efforts focused on Colleague going forward, Sigma and our next generation platform recognizing that the response to Sigma to date has been very good, very good. And we were moving down a path where we were hopeful that we can launch our next generation platform into the U.S. market in the not-too-distant future.

So we are managing all those things. I think that the good news is for the first time in a long time with the Sigma deal, we are able to proactively promote an infusion pump. Hospitals continue to hang on to the Colleagues remediated or un-remediated because frankly most of our hospital customers continue to be very satisfied with the product. But it is an aging device and at the right time we need to reassess where we allocate our promotional focus in our resources between really now a three, what will be a three-product family.

(Emphasis added).

98.     After the conference, Baxter's stock closed up $2.35 per share, or over 4%, to close at

$57.16 per share on September 17, 2009.

99.     On October 15, 2009, Baxter issued a press release reporting the Company's financial

34

results for the third quarter of 2009. The Company reported BioScience revenue of $1.4 billion for the quarter. Baxter further forecast sales growth for the fourth quarter of 2009 of 6-8%.

100.    After releasing its third quarter 2009 earnings results on October 15, 2009, Baxter hosted a conference call for analysts, media representatives and investors. During the call Defendant Davis stated, in relevant part:

> *To summarize, we continue to see strong demand and favorable year-on-year price improvements across the entire plasma protein portfolio*.
>
> In antibody therapy, sales of $336 million grew 9% and excluding foreign currency, sales advanced 12%. This is the continued result of increased demand and higher year-on-year prices. *Additionally, we continue to estimate demand growth in high single digits at the high-end of the mid to high single digit longer term guidance we provided at our investor conference last month*.

(Emphasis added).

101.    On November 11, 2009, Baxter participated in the Credit Suisse Healthcare Conference for analysts and the media, during which Defendant Davis stated the following, in relevant part:

> If you focus on our first business, which is our largest business, that being bioscience. In 2008 we enjoyed sales of $5.3 billion and this was spread across our recombinant franchises, our plasma proteins, regenerative medicine, and vaccines. *As we've talked about at our recent investor conference we had a couple of years ago, we do expect to see growth in this business on the top line of 7% to 9% overall long range plan*. And I'll talk about here in a moment some of the key areas we see, which will really allow us to drive that kind of growth in this business.

(Emphasis added).

102.    On December 2, 2010, Defendant Riedel benefited from the artificial inflation in Baxter's stock price caused in part by his false statements by selling 92,500 shares of his Baxter stock at an average price of $55.92 per share for proceeds of over $5.1 million.

103.    On December 7, 2010, Defendant Shapazian benefited from the artificial inflation in Baxter's stock price caused in part by her breaches of fiduciary duty to the Company by selling

5,760 shares of her Baxter stock at an average price of $56.14 per share for proceeds of over $323,000.

104.    On January 12, 2010, Baxter participated in the JP Morgan Healthcare Conference for analysts, media representatives and investors, during which Defendant Davis stated the following, in relevant part:

> BioScience is our largest business with sales in 2008 of $5.3 billion. ***And as you look out over our long-range horizon, we do expect the BioScience business to continue to grow in the 7% to 9% on a compounded average basis.***
>
> *            *            *
>
> Another key franchise for the Company is our plasma biotherapeutics business. And as you can see here from the chart, ***we continue to believe we are going to see strong growth in demand in this business***. And I would comment up front that as we look at a lot of noise we've heard recently on people focusing on the quarter-to-quarter moves in this business, I would take you back to the detailed presentation we gave in September and tell you that our outlook for the long-term of this business with growth in demand in the mid-to high-single digits has not changed.
>
> *            *            *
>
> So as we look at this business, ***we continue to have confidence in it, we continue to see it as a sustainable growth business for the Company and one which will continue to drive value for the Company***.
>
> *            *            *
>
> So as you look at the culmination of all of those businesses and as we look out over our long-range plan, we do believe ***we are going to be able to deliver sales growth in the 7% to 8% range with gross margins approaching 55%***, operating margins around 28%, and you can see EPS in the 11% to 13%. So we will continue to be able to drive good leverage of our sales line into our EPS and, obviously, continue to generate very strong cash flow.
>
> *            *            *
>
> ***Obviously, a key part of our story over the last couple of years has been our ability to drive gross margin expansion. And I will tell you that we will continue to do this into the future***. And as you look at the drivers of what will allow us to do that, it's largely the same drivers we've had today. It's going to be mix upgrades, first, at the highest level, with business mix driving margin expansion with bioscience being our highest-margin business, also the fastest-growing business, as well as product upgrades within each of the businesses. So you are going to get mix at a different

36

level. And between, really, those two areas, that will be the majority of what will drive margin expansion into the future to that 55% range I mentioned, and has been, frankly, what has driven it up to this point, more so than I think most people understand.

(Emphasis added).

105.    On January 28, 2010, Baxter issued a press release reporting the Company's financial results for the full year and fourth quarter of 2009.  The Company reported BioScience revenue of $1.5 billion for the quarter. The release further provided, in relevant part:

> Baxter also announced today its guidance for the full year and first quarter of 2010. *For full-year 2010, Baxter expects sales, excluding the impact of foreign exchange, to grow 5 to 7 percent.* Including the benefit of foreign exchange, Baxter expects reported sales growth to increase 7 to 9 percent compared to 2009, based on current exchange rates. *The company also expects earnings per diluted share of $4.20 to $4.28, before any special items,* and expects to generate cash flow from operations of approximately $2.9 billion.
>
> For the first quarter of 2010, Baxter expects sales growth, excluding the impact of foreign exchange, of approximately 5 to 7 percent. Including the benefit of foreign exchange, the company expects reported sales growth of approximately 10 to 12 percent compared to the first quarter of 2009, based on current exchange rates. The company also expects earnings per diluted share of $0.92 to $0.94, before any special items.
>
> "Our 2010 guidance reflects balance across the businesses, continued global expansion, and our ability to deliver sustainable growth," said Robert M. Davis, corporate vice president and chief financial officer. "It is aligned with our long-range strategic and financial objectives, as we remain focused on delivering growth while making appropriate investments for the future.

(Emphasis added).

106.    After releasing its fourth quarter 2009 results on January 28, 2010, Baxter hosted a conference call for analysts, media representatives and investors.  During the call, Defendants Parkinson and Davis stated in part:

> For the full year antibody therapy sales totaled $1.4 billion and increased 14% on a constant currency basis driven by higher global demand and year-on-year price increases. I'd mention that *we remain confident in the underlying fundamentals of this business and have not changed our outlook of mid- to high-single-digit growth in demand over our LRP.*

37

\*      \*      \*

Finally, for the BioScience business we expect sales growth, excluding foreign currency, to be in the 6% to 8% range. First, we expect recombinant sales growth in the 6% to 8% range. Second, *we expect plasma protein sales to grow in mid- to high-single-digits, and antibody therapy sales to grow in the mid-single-digit range*. Third, we expect the regenerative medicine business to again grow in mid teens.

\*      \*      \*

*[I]t's only been what, four months since our investor conference, but there's nothing that's changed since then that would suggest we would deviate from our long-term outlook, long-term aspirations*. Obviously the guidance we provide of EPS growth in 2010 is right in line with the 11% to 13% compounded EPS growth that we projected over the LRP.

(Emphasis added).

107.   On March 3, 2010, Defendant Stallkamp benefited from the artificial inflation in Baxter's stock price caused in part by his breaches of fiduciary duty to the Company by selling 10,000 shares of his Baxter stock at an average price of $59.10 per share for proceeds of over $590,000.

108.   On March 5, 2010, Defendant Riedel benefited from the artificial inflation in Baxter's stock price caused in part by his false statements by selling 75,600 shares of his Baxter stock at an average price of $59.29 per share for proceeds of over $4.4 million.

E.   The Truth Emerges

109.   On April 22, 2010, Baxter issued a press release reporting the Company's financial results for the first quarter of 2010 and providing updated guidance for the second quarter and full year 2010. The release stated, in relevant part:

Baxter also announced today its guidance for the second quarter of 2010 and *lowered its guidance for the full year*.

Previously, Baxter expected full-year 2010 sales growth, excluding the impact of foreign exchange, of 5 to 7 percent (or 7 to 9 percent including foreign exchange); full-year earnings per diluted share of $4.20 to $4.28, before any special items; and cash flow from operations of approximately $2.9 billion.

38

For full-year 2010, Baxter's revised outlook includes sales growth, excluding the impact of foreign exchange, of *1 to 3 percent* (or 3 to 5 percent including the benefit of foreign exchange) and earnings, before any special items, of *$3.92 to $4.00* per diluted share. This outlook now includes the full-year impact of U.S. healthcare reform legislation enacted in the first quarter. In addition, Baxter now expects to generate cash flows from operations of approximately $2.7 billion.

"*Our revised financial guidance primarily reflects the impact of recent healthcare reform legislation in the U.S. and our outlook for continued plasma market pressures*," explained Robert M. Davis, chief financial officer. "Despite these factors, we will continue to pursue opportunities to enhance growth through the development of new products and business development initiatives, while maintaining an intense focus on managing costs throughout the company."

For the second quarter of 2010, the company expects sales growth, excluding the impact of foreign exchange, of 0 to 2 percent (or 3 to 5 percent including the benefit of foreign exchange), and earnings, before any special items, of $0.90 to $0.93 per diluted share.

(Emphasis added).

110. On this news, Baxter's stock collapsed $7.82 per share to close at $51.13 per share on April 22, 2010, a one-day decline of over 13%, on volume of more than 50 million shares as artificial inflation came out of the stock price. This was the largest one-day decline in the share price of Baxter stock in over seven years.

111. On May 3, 2010, Baxter issued a press release announcing it was recalling all Colleague Infusion Pumps in the U.S. The release stated, in relevant part:

Baxter Healthcare Corporation today announced that it will recall Colleague infusion pumps from the U.S. market pursuant to an order under its existing June 2006 consent decree with the U.S. Food and Drug Administration (FDA). Baxter will work with the FDA to ensure that the recall process provides customers appropriate alternatives for supporting patients' needs.

As previously disclosed, Baxter entered into a consent decree with FDA under which the company has been pursuing remediation of the infusion pumps. The decree permits FDA to require the recall of the pumps, and FDA has communicated to the company that it will require such a recall, with the company providing monetary consideration or replacement pumps to customers on a timeline to be determined with FDA and based on medical need. Baxter intends to work with FDA to minimize disruption to healthcare facilities using Colleague pumps. Baxter anticipates that, among alternatives to be provided to customers, the company will offer to exchange

Baxter's Sigma SPECTRUM infusion pumps for Colleague infusion pumps without charge to customers.

The consent decree permits Baxter to propose alternative actions to achieve the FDA's objectives under the decree, which the company intends to do. The final nature of the recall and offer to customers remain subject to that ongoing dialogue.

Once final, Baxter will notify customers and make information available on www.baxter.com.

***Notwithstanding that uncertainty, the company currently anticipates that it will record a pre-tax special charge of $400 to $600 million in the first quarter for the reasonably estimable cost of the recall. The company is not otherwise revising its earnings guidance for the year in connection with the recall.***

(Emphasis added).

112.    On the same day, the FDA issued a statement concerning the recall of the Colleague

Infusion Pumps, which stated, in relevant part:

The U.S. Food and Drug Administration sent a letter to Baxter Healthcare Corp. on April 30 ***ordering*** the company to recall and destroy all of its Colleague Volumetric Infusion Pumps (Colleague pumps) currently in use in the United States. This action is based on a longstanding failure to correct many serious problems with the pumps. The FDA believes there may be as many as 200,000 of those pumps currently in use.

Additionally, the FDA is ***ordering*** the company to provide refunds to customers or replace pumps at no cost to customers [to] help defray the cost of replacement.

Infusion pumps are devices that deliver fluids, including nutrients and medications, into a patient's body in a controlled manner. They are widely used in hospitals, other clinical settings and, increasingly, in the home because they allow a greater level of accuracy in fluid delivery.

Hospitals and other users of Baxter's Colleague pumps will be receiving further instruction and information from Baxter and the FDA regarding their transition.

The FDA has been working with Baxter since 1999 to correct numerous device flaws. Since then, Colleague pumps have been the subject of several Class I recalls for battery swelling, inadvertent power off, service data errors, and other issues.

In June 2006, the FDA was [sic] obtained a consent decree of permanent injunction in which Baxter agreed to stop manufacturing and distributing all models of the Colleague pump until the company corrected manufacturing deficiencies and until devices in use were brought into compliance. Since then, Baxter has made numerous changes to the Colleague pumps but these changes have not corrected the product defect leading to the permanent injunction.

On April 8, 2010, Baxter submitted a proposed correction schedule to the FDA that stated that Baxter did not plan to begin the latest round of corrections to the adulterated and misbranded pumps until May 2012. The proposal also stated that Baxter does not anticipate completion of the proposed corrections until 2013. On that schedule, a device with known safety concerns would remain in use on patients needing specialized care until 2013. FDA found this proposal unacceptable. The 2006 consent decree gave FDA authority to take any action it deemed appropriate.

***The FDA has determined that this action is necessary, as Baxter has failed to adequately correct, within a reasonable timeframe, the deficiencies in the Colleague infusion pumps still in use.***

Therefore the FDA is now ordering Baxter to:

•      Recall and destroy all Colleague infusion pumps.

•      Reimburse customers for the value of the recalled device

•      Assist in finding a replacement for these customers.

Infusion pumps, including the Baxter Colleague models, have been the source of persistent safety problems. ***In the past five years, the FDA has received more than 56,000 reports of adverse events associated with the use of infusion pumps. Those events have included serious injuries and more than 500 deaths. Between 2005 and 2009, 87 infusion pump recalls were conducted to address identified safety concerns, according to FDA data.***

An FDA analysis of these adverse events has uncovered software defects, user interface problems and mechanical and electrical failures. Problems with infusion pumps are not confined to one manufacturer or one type of device.

In response, last month the FDA announced a new initiative to address safety problems associated with infusion pumps. As part of its initiative, the FDA is moving to establish additional premarket requirements manufacturers will be expected to meet, in part through static testing in FDA's facilities before device submissions. The FDA is also holding a May public workshop on infusion pump design, and the agency is raising public awareness of the issue among health care workers and patients.

(Emphasis added).

113.      On this disclosure, Baxter's stock dropped $2.42 per share, or over 5%, to close at $45.08 per share on May 4, 2010 on high volume.

114.      During the Relevant Period, the Defendants breached their duties to Baxter by: (1) concealing from investors the material fact that the failure of a proposed merger between Baxter's

two largest competitors in the plasma-derived therapies market was resulting in increased supplies of plasma-based products and increased pricing pressure; (2) failing to disclose observed negative trends and uncertainties related to the market for Baxter's plasma-derivative products, including that the boost in market share and gross profit margin Baxter had experienced while the merger was pending was only temporary; (3) lacking a reasonable basis for and, actually misstating Baxter's revenue guidance for 2010 related to the Company's plasma-based products and BioScience division as a whole; (4) failing to disclose that Baxter was not complying with the 2006 Consent Decree with the FDA concerning its Colleague Infusion Pumps; (5) misleading investors that the Company would be able to complete the remediation of Baxter's Colleague Infusion Pumps in 2010; and (6) misrepresenting that the Company had adequate controls over timely and truthful reporting of material events and the ability to handle its operations when, in truth, due to Defendants' wrongful conduct, the Company had neither.

115.    As a result of the foregoing, on September 9, 2010, a securities class action was commenced against the Company on behalf of purchasers of Baxter common stock claims asserting claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934,15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

F.    Insider Trading

116.    The Insider Trading Defendants, by virtue of their positions as either Directors (Shapazian and Stallkamp) and/or the Chief Scientific Officer (Reidel) of the Company knew that the Company suffered from serious quality control flaws, and further that the Company made a number of false and misleading statements to the public both about its quality control measures, intention to adhere to its obligations under the 2006 Consent Order, and unsustainable continued profitability of its plasma business.

117.    Defendant Shapazian sold 5,760 shares on December 7, 2009, trading on insider

information, for proceeds of $323,366:

| Defendant Shapazian | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 12/07/09 | 5,760 | $56.14 | $323,366 |

118.     Defendant Stallkamp sold 20,590 shares on March 3, 2010 and February 12, 2009, trading on insider information, for proceeds of $1,210,727:

| Defendant Stallkamp | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 03/03/10 | 10,000 | $59.10 | $591,000 |
| 02/12/09 | 10,590 | $58.52 | $619,727 |

119.     Defendant Riedel sold 168,100 shares on March 5, 2010 and December 2, 2009 for proceeds of $9,654,924:

| Defendant Riedel | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 03/05/10 | 75,600 | $59.29 | $4,482,324 |
| 12/02/09 | 92,500 | $55.92 | $5,172,600 |

120.     In total, during the relevant period, the Insider Trading Defendants sold shares, while in possession of material nonpublic information, for proceeds in excess of $11 million.

G.     Substantial Harm to Baxter

121.     By engaging in the misconduct detailed above, in violation of their fiduciary duties, the Defendants breached their fiduciary duties to Baxter, committed gross mismanagement, abused their control of Baxter and have engaged in a gross dereliction of their duties as well as corporate waste by, *inter alia*, knowingly, willfully, and/or intentionally:

          (a)     failing to adequately supervise and concealing from the public the true facts concerning the Company's lack of quality control measure over raw materials necessary for manufacturing its pharmaceutical products in connection with the Heparin contamination;

          (b)     failing to adequately supervise and concealing from the public the true facts

concerning the actions of the Company in connection with Baxter's Colleague pump;

(c)  failing to adequately supervise the operations of Baxter in a manner consistent with preventing the deceptive practices complained of herein;

(d)  failing to adequately supervise the officers and employees of Baxter, and failing to ensure that they act with honesty and integrity in order to preserve Baxter's financial resources and enhance Baxter's reputation in the business community;

(e)  exposing Baxter to potential liability of hundreds of millions of dollars, as well as lost goodwill as a result of their repeated failures to adequately supervise Baxter's operations and employees and to prevent their self-dealing and their attempt to conceal the damage to Baxter;

(f)  causing the Company to be liable for the defense and indemnification of those directors and officers responsible for exposing Baxter to liability in the above-mentioned legal violations and other actions; and

(g)  subjecting the Company to multiple product liability and wrongful death class action lawsuits for which the Company is self-insured.

122.  The Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at Baxter, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with Baxter and the financial benefits that flow therefrom.

123.  As a result of the Defendants' wrongful and illegal actions, including their abuse of control and participation in the misconduct and concealment and the failure to maintain a system of internal controls adequate to ensure that public statements issued by Baxter during the Relevant Period were correct and complete in all material respects, Baxter has suffered considerable damage

44

to, and drastic diminution in value, of its assets, goodwill and reputation in the financial community.

124.    Without judicial intervention, Baxter will expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures would include, but not be limited to:

(a)    costs incurred as a result of settlements, fines, penalties and judgments related to Defendants' violation of applicable law;

(b)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(c)    costs and legal fees for defending Baxter, its officers and its directors against prosecution for the misconduct alleged herein.

## COUNT I

### Derivative Claim Against All
### Defendants for Breach of Fiduciary Duty

125.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.    Defendants knowingly, willfully and/or intentionally breached their duties of loyalty and good faith by knowingly concealing and/or allowing the concealment of material facts from Baxter shareholders.

127.    As officers and/or directors of a publicly held company, the Defendants had a duty to act in the best interest of the Company's shareholders and to refrain from either knowingly or recklessly engaging in wrongful conduct themselves, or financially rewarding others for falsifying Company records and other misconduct.  In addition, at all times, the Defendants had a duty to promptly disseminate accurate and truthful information with respect to Baxter's operations, and affairs.  The Defendants instead concealed their wrongdoing and, as a result thereof, disseminated

false and misleading statements and reports about Baxter.

128.     The Defendants, in their roles as executives and directors of Baxter, participated in the acts of mismanagement alleged herein, and knowingly, willfully, and/or intentionally disregarded adverse facts known to them, and did nothing to reveal them.  They thereby breached their fiduciary duties of care, loyalty, accountability and disclosure to Baxter and its shareholders.

129.     The Defendants each owed a fiduciary duty to Baxter to monitor Baxter's disclosure procedures and to ensure that they were performed in a competent and professional manner.  The Defendants failed to fulfill these fiduciary duties through the issuance of various material misstatements and omissions to cover up the true state of affairs.

130.     The Defendants each further owed a fiduciary duty to Baxter and to Baxter's stockholders to seek redress from those whose conduct has caused and will cause the Company to expend its assets and whose conduct has otherwise precipitated the potentially illegal activities alleged herein.  The Defendants have not done so.

131.     All Defendants breached and/or aided and abetted these breaches of fiduciary duties owed to Baxter and its shareholders.

132.     The conduct outlined herein was not due to an honest error of judgment, but rather was due to the Defendants' bad faith and was done knowingly, willfully and/or intentionally, and resulted in losses to Baxter and its shareholders.

## COUNT II

### Derivative Claim Against All
### Defendants for Gross Mismanagement

133.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.     As detailed more fully herein, the Defendants who were officers, directors and/or

46

employees of Baxter each had a duty to Baxter and its shareholders to prudently supervise, manage and control Baxter's operations.

135.    The Defendants by their actions, either directly, or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of Baxter in a manner consistent with the operations of a publicly held corporation.

136.    By subjecting Baxter to the unreasonable risk of liability by engaging in the potentially illegal and clearly improper actions described herein, and by concealing these actions and their effects on Baxter, the Defendants knowingly and/or recklessly breached their duties of due care and diligence in the management and administration of Baxter's affairs and in the use and preservation of Baxter's assets.

137.    The Defendants caused the Company to engage in these potentially illegal and improper actions and were aware that these actions had the purpose and effect of misleading shareholders, and subjecting the Company to millions of dollars in potential legal liability associated with such illegal actions.  During the course of the discharge of their duties, these Defendants knew or should have known of the unreasonable risks and losses associated with such illegal behavior, yet these Defendants caused Baxter to engage in this scheme which these Defendants knew had an unreasonable risk of material loss to Baxter, thus breaching their duties to both Baxter and its shareholders.  As a result, the Defendants grossly mismanaged or aided and abetted the gross mismanagement of Baxter and its assets by causing it to engage in the illegal behavior complained of herein, which the Defendants knew would likely lead to material and substantial losses.

138.    As a proximate result thereof, Baxter has been damaged and will continue to suffer damages, and has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law.

**COUNT III**

47

**Derivative Claim Against All**
**Defendants for Waste of Corporate Assets**

139.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.     As a result of the foregoing conduct, Defendants have subjected the Company to potential material liability for violations of federal and state law, possibly reaching hundreds of millions of dollars in damages, as well as significant legal defense fees.

141.     By reason of the foregoing, Baxter has been damaged and has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law.

**COUNT IV**

**Against Insider Trading Defendants for Breach of Fiduciary**
**Duties for Insider Trading and Misappropriation of Information**

142.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding and subsequent paragraphs, as though fully set forth herein.

143.     At the time of the stock sales set forth herein, the Insider Trading Defendants knew the information described above, and sold Baxter common stock on the basis of such information.

144.     The information described above was proprietary non-public information concerning, among other matters, the Company's violation of the 2006 Consent Order, the Company's true financial condition, lack of internal controls, and future business prospects. The information was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Baxter common stock.

145.     The Insider Trading Defendants' sales of Baxter common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

146.     Since the use of the Company's proprietary information for their own gain constitutes

48

a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## COUNT V

### Against All Defendants for Unjust Enrichment

147.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding and subsequent paragraphs, as though fully set forth herein.

148.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Baxter.

149.     Plaintiff, as a shareholder and representative of Baxter seeks restitution from each Defendant, and an order of this Court disgorging all profits, benefits, and other compensation obtained through wrongful breaches of fiduciary duties discussed herein.

## COUNT VI

### Against All Defendants for Breach of Fiduciary Duties for Abuse of Control

150.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding and subsequent paragraphs, as though fully set forth herein.

151.     Defendants' misconduct alleged herein constituted, and continues to constitute, an abuse of their ability to control and influence Baxter for which they are legally responsible.  In particular, Defendants abused their positions of authority by allowing Baxter to issue false and misleading financial statements, not establishing appropriate internal controls over operations and allowing self-dealing transactions and insider trading, utilizing material non-public information.

152.     As a direct and proximate result of Defendants' abuse of control, Baxter has sustained significant damages.  These damages include, but are not limited to, Baxter's severe loss of market value, customer trust in the Company's credibility, and goodwill.

### PRAYER FOR RELIEF

49

**WHEREFORE**, Plaintiff, on behalf of Baxter, demands judgment as follows:

A.      Declaring that the Defendants, and each of them, have committed breaches of their fiduciary duties to Baxter, abused their control, grossly mismanaged Baxter, and committed the potentially illegal and clearly improper actions complained of herein;

B.      Requiring the Defendants to pay Baxter the amounts by which the Company has been damaged by reason of the conduct complained of herein and to indemnify Baxter for any claims brought against Baxter by any of its officers, directors, employees, or by any third party;

C.      Entering equitable and/or injunctive relief as permitted by law, including disgorging, attaching, impounding, imposing a constructive trust on or otherwise restricting the value of the proceeds of Defendants' insider trading activities or their other assets so as to assure that Plaintiff on behalf of Baxter has an effective remedy;

D.      Directing Baxter to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and undertake all reasonable corporate governance reforms necessary to ensure that the wrongdoing alleged in this Complaint does not recur.

E.      Ordering that the Defendants personally bear their own legal fees in defending any and all claims arising out of these matters, whether asserted by stockholders or the government, and not be indemnified by the corporation or any insurance;

F.      Awarding punitive damages;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

H.      Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provision sued hereunder, including enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from further enriching themselves at the

expense of the Company; and

      I.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

      Plaintiff demands a trial by jury.

Dated:  January 10, 2011              FREED KANNER LONDON & MILLEN LLC

                                    s/ Michael J. Freed
                                    Michael J. Freed
                                    Steven A. Kanner
                                    Donald L. Sawyer
                                    2201 Waukegan Road, Suite 130
                                    Bannockburn, IL 60015 USA
                                    Telephone:  (224) 632-4500
                                    Facsimile:  (224) 632-4521
                                    Email:  mfreed@fklmlaw.com

                                    SCOTT+SCOTT LLP
                                    David R. Scott
                                    156 South Main Street
                                    P. O. Box 192
                                    Colchester, CT  06415
                                    Telephone:  (860) 537-5537
                                    Facsimile:  (860) 537-4432
                                    Email:  drscott@scott-scott.com

                                    SCOTT+SCOTT LLP
                                    Judith S. Scolnick
                                    Donald A. Broggi
                                    500 Fifth Avenue, 40th Floor
                                    New York, NY  10110
                                    Telephone:  (212) 223-6444
                                    Facsimile:  (212) 223-6334
                                    Email:  jscolnick@scott-scott.com
                                               dbroggi@scott-scott.com

SCOTT+SCOTT LLP
Hal Cunningham
707 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  (619) 233-4565
Facsimile:  (619) 233-0508
Email:  hcunningham@scott-scott.com

*Counsel for Plaintiff Westmoreland County Employee
Retirement System*